**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Chris Wolters,

       Plaintiff, on behalf of
himself and all those similarly situated,

Case No.: 0:25-cv-3280

v.

Sweepsteaks, Ltd. d/b/a Stake.us,

       Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2

LEGAL STANDARD................................................................................................3

ARGUMENT .............................................................................................................4

    I.     No agreement to arbitrate exists between Mr. Wolters and Stake. .............4

        A. This Court's analysis is bound by the Terms' specific written provisions conditioned upon agreement to the Terms as a whole. .........4

        B. Stake designated agreeing to its Terms as the manner of accepting its offers to arbitrate. ...............................................................................7

        C. Mr. Wolters could not agree to the Terms because they are void for violating Minnesota's public policy prohibiting unlicensed gambling. .9

            1. *Contracts in Minnesota are void if they contemplate the unlicensed provision of services in violation of statutes intended to protect the public.* .................................................9

            2. *The Terms are void because they primarily convey the ability to use Stake.us, which is prohibited and penalized by Minnesota statutes intended to protect the public from unregulated gambling.* .......................................................12

                i. *Minnesota law requires, and Stake does not and could not possess, a license to operate a gambling business like Stake.us.* ...........................................12

                ii. *Minnesota law prohibits and penalizes the unlicensed operation of Stake.us.* ..........................13

                iii. *Minnesota prohibits and penalizes Stake.us to promote its public policy of protecting its citizens from unregulated gambling.* ...................................15

D. There is no agreement to arbitrate Mr. Wolters' claims because no agreement to be bound by the Terms was ever formed. ........................17

II. The purported agreement to arbitrate is also unenforceable because it is unconscionable. ...............................................................................................18

A. Contracts that are unreasonably favorable to one party and to which the other party did not have a meaningful chance to agree are unconscionable in Minnesota. ............................................................18

B. The Terms are substantively unconscionable because they unreasonably favor Stake by insulating it from liability. ...........................................20

    1. *The Terms make it practically impossible for anyone with claims against Stake to ever vindicate their rights.*...........20

    2. *For the few that find individual legal representation against Stake, their arbitrations will necessarily be delayed even further by the Terms.*..................................22

    3. *The Terms otherwise prohibitively disincentivize arbitrating against Stake.* ................................................23

    4. *The unconscionable provisions of the Terms render the purported agreement to arbitrate with Stake unconscionable.* ............................................................25

C. The Terms are procedurally unconscionable because Mr. Wolters cannot meaningfully agree to Terms that Stake may unilaterally change without notice. ................................................................................26

D. This Court should not enforce the purported agreement to arbitrate between Mr. Wolters and Stake because it requires acceptance of the unconscionable Terms and, thus, is itself unconscionable. ..................29

III. Stake has failed to meet its burden to prove that an agreement to arbitrate exists between itself and Mr. Wolters. .....................................................29

IV. This Court should not stay any deadlines during the pendency of the instant Motion. ..............................................................................................32

CONCLUSION.................................................................................................32

# TABLE OF AUTHORITIES

## Cases

**Page**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011).................................................................................18

*Ballou v. Asset Marketing Servs., LLC*,
46 F.4th 844 (8th Cir. 2022) ..............................................................3, 4

*Barna, Guzy & Steffen, Ltd. v. Beens*,
541 N.W.2d 354 (Minn. App. 1995) ...........................................................21

*Buckeye Check Cashing v. Cardegna*,
546 U.S. 440 (2006)..............................................................................5, 7

*Butler v. ATS Inc.*,
Case No. 20-CV-1631 (PJS/LIB) (D. Minn. Apr 13, 2021) .........................19

*Carey v. 24 Hour Fitness, USA, Inc.*,
669 F.3d 202 (5th Cir. 2012) ...................................................................27

*Close v. Penney OpCo LLC*,
787 F.Supp.3d 1166 (W.D. Wash. 2025) .....................................................27

*Coinbase, Inc. v. Suski*,
144 S.Ct. 1186 (2023).................................................................................7

*Com. Assocs., Inc. v. Work Connection, Inc.*,
712 N.W.2d 772 (Minn. App. 2006) .............................................................8

*Dick Weatherston's Associated Mechanical Services, Inc. v. Minnesota Mutual
Life Insurance Company*,
100 N.W.2d 819 (Minn. 1960) ...................................................................11

*Dumais v. Am. Golf Corp.*,
299 F.3d 1216 (10th Cir. 2002) ..................................................................27

*Duncan v. Int'l Markets Live, Inc.*,
20 F.4th 400 (8th Cir. 2021) ................................................................3, 30

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)..............................................................................5, 7

*Floss v. Ryan's Family Steak Houses*, Inc.,
211 F.3d 306 (6th Cir. 2000) ...................................................................27

*Foster v. Walmart, Inc.*,
15 F.4th 860 (8th Cir. 2021)........................................................8, 30, 31

*Gibson v. Neighborhood Health Clinics, Inc.*,
121 F.3d 1126 (7th Cir. 1997) ....................................................................27

*Hearing Assocs., Inc. v. Downs*,
2017 WL 2414852 (Minn. App. Jun 05, 2017) ........................................8, 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019)..........................................................................................5

*Hooters of Am., Inc. v. Phillips*,
173 F.3d 933 (4th Cir. 1999) ........................................................................27

*Hoober v. Movement Mortg., LLC*,
382 F.Supp.3d 1148 (W.D. Wash. 2019) ......................................................25

*In re Peterson's Estate*,
42 N.W.2d 59, (Minn. 1950) ........................................................................11

*Isles Wellness, Inc. v. Progressive N. Ins. Co.*,
725 N.W.2d 90 (Minn. 2006) .................................................................10, 12

*Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., Inc.*,
589 N.W.2d 499 (Minn. App. 1999) ..............................................................19

*Lew Bonn Co. v. Herman*,
135 N.W.2d 222 (Minn. 1965) .................................................................9, 12

*MacClelland v. Cellco P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022).........................................................21

*Neb. Mach. Co. v. Cargotec Sols., LLC*,
762 F.3d 737 (8th Cir. 2014) .....................................................................3, 30

*Northport Health Servs. of Ark., LLC v. Posey*,
930 F.3d 1027 (8th Cir. 2019) ........................................................................5

*Oetting v. Sosne (In re Green Jacobson, P.C.)*,
911 F.3d 924 (8th Cir. 2018) ........................................................................32

*Plummer v. McSweeney*,
941 F.3d 341 (8th Cir. 2019) ........................................................................29

*Rent-A-Center, W., Inc. v. Jackson*,
130 S.Ct. 2772 (2010)...........................................................................4, 6, 7

*RJM Sales & Marketing v. Banfi Products Corp.*,
546 F. Supp. 1368 (D. Minn. 1982) ..............................................................19

*Solomon v. Dreschler*,
4 Minn. 278 (Minn. 1860) ...........................................................10, 11, 15, 16

*Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*,

811 F. Supp. 1372, 1380 (D. Minn. 1993) .................................................26

*United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*,
413 F.3d 786 (8th Cir. 2005) ..................................................................5

*Walters v. Nat'l Ass'n of Radiation Survivors*,
473 U.S. 305 (1985)................................................................................21

*Woischke v. Stursberg & Fine, Inc.*,
906 N.W.2d 586 (Minn. App. 2018), vacated on other grounds in *Woischke v. Stursberg & Fine, Inc.*, 920 N.W.2d 419 (Minn. 2018) ......9, 10, 11, 12, 15

## Statutes

Minn. Stat. § 349.11 ...............................................................................15
Minn. Stat. § 349.12 ......................................................................3, 13, 16
Minn. Stat. § 349.15 ...............................................................................16
Minn. Stat. § 349.151 .............................................................................16
Minn. Stat. § 349.155 .............................................................................13
Minn. Stat. § 349.16 ...............................................................................13
Minn. Stat. § 541.20 ...............................................................................14
Minn. Stat. § 541.21 ...............................................................................14
Minn. Stat. § 609.75.........................................................................3, 13
Minn. Stat. § 609.755 .............................................................................14
Minn. Stat. § 609.76.....................................................................3, 13, 14
Minn. Stat. § 609.761 .......................................................................13, 14
9 U.S.C. § 2 .....................................................................6, 7, 17, 18, 29
9 U.S.C. § 3 ............................................................................................32
9 U.S.C. § 4 ........................................................................................4, 30

## Other Authorities

American Arbitration Association Consumer Rules .................................23
American Arbitration Association Due Process Protocol .......................23
*Attorney General Ellison directs illegal gambling websites to stop offering services in Minnesota*
https://www.ag.state.mn.us/Office/Communications/2025/11/05_IllegalGam blingWebsites.asp .................................................................................17
Black's Law Dictionary (12th ed. 2024) ................................................10
Minn. R. 7861.0220 ................................................................................16
Minn. R. 7861.0230 ................................................................................16
Minn. R. 7861.0270 ................................................................................16

**<u>INTRODUCTION</u>**

Before this Court is the question whether Defendant Sweepsteaks, Ltd. ("Stake") may confidentially arbitrate the legality of its plainly forbidden internet casino. Even if the Court were inclined to sever the arbitration provisions from their broader illegal contracts, that is not applicable here under the very terms of Stake's Terms and Conditions.

In every version of Stake's Terms and Conditions ("the Terms"), users of Stake.us agree to arbitrate against Stake only "[b]y agreeing to these Terms." Accordingly, the only way a person may accept Stake's agreement to arbitrate is to form an agreement to be bound by the Terms in their entirety. In other words, agreeing to the Terms is a precondition to the formation of an agreement to arbitrate.

Here, there is no such agreement between Mr. Wolters and Stake because Minnesota law precludes the formation of contracts for illegal gambling. Accordingly, the precondition to agree to the Terms was not satisfied and therefore no agreement to arbitrate the disputes in Mr. Wolters' complaint exists. This Court must deny Stake's Motion to Compel Arbitration because there is no arbitration agreement.

1

## BACKGROUND

Stake operates the website Stake.us. Anyone in Minnesota with access to a Stake.us account may visit and use Stake.us. *See* Def. Mot. to Compel Arbitration at 2, ECF No. 14. Users of the website (the "Players") can buy Stake's digital currency with fiat or crypto currency and wager it on the outcome of a wide range of games of chance. Compl. ¶ 16-17.

Stake sells two varieties of digital currency: Gold Coins and Stake Cash. *Id.* at ¶ 17. They can only be purchased together in a bundle. *Id.* ¶ 20. These bundles are priced such that Players receive practically one Stake Cash and 10,000 Gold Coins for every $1 USD they spend on Stake.us. *Id.* After playing Stake's casino games and subject to minimum bet requirements,[1] Players can redeem what remains in their "wallet" for fiat or crypto currency (*Id.* at § 13.4(c)) "at an implied rate of 1 Stake Cash per 1 USD." ECF No. 14-5, Ex. D, Stake.us Terms & Conditions §§ 13.5(d), 13.4(c). Stake calls Stake.us "an entertaining online social gaming platform," not an internet casino. ECF No. 14 at 1.

The operation of a gambling business in Minnesota is subject to the strict restrictions in Chapter 349 of Minnesota's Civil Code, which also created the

---

[1] Players must bet three times the amount of Stake Cash they purchase before being able to redeem it for cryptocurrency. ECF No. 14-5, Ex. D § 13.1(c). ("With the exception of Stake Cash won through [Stake.us' games], all [Players] are required to play their Stake Cash three (3) times before they are eligible to be redeemed for Prizes.").

2

Minnesota Gambling Control Board to regulate lawful gambling. Gambling in contravention of these statutes and regulations is criminalized under Minn. Stat. §§ 609.75 *et seq*. Except for certain exceptions that do not apply here, "lawful gambling" in Minnesota is limited to bingo, raffles, paddlewheels, tipboards, and pull-tabs conducted by licensed non-profit organizations. Minn. Stat. § 349.12, subds. 24, 28. Stake does not possess a license to conduct lawful gambling in Minnesota, nor could it possibly obtain one. Moreover, unless associated with licensed, lawful gambling, it is a felony to instruct another to violate Minnesota's criminal gambling laws. Minn. Stat. § 609.76, subd. 7.

## LEGAL STANDARD

Stake moves this Court to compel arbitration. Where, as here, parties to a motion to compel arbitration introduce evidence in support of or in opposition to the motion, "the district court treats the motion akin to a motion for summary judgment." *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 (8th Cir. 2021); *see also Ballou v. Asset Marketing Servs., LLC*, 46 F.4th 844, 850-51 (8th Cir. 2022). Accordingly, this Court "may decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration." *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 743 (8th Cir. 2014) (quotations omitted). Otherwise, if there is a material fact

3

dispute about "the making of an arbitration agreement . . . the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *accord Ballou*, 46 F.4th at 850.

## ARGUMENT

This Court should deny Stake's Motion because there is no agreement to arbitrate between Mr. Wolters and Stake. Even if such an agreement exists, however, it is unconscionable and unenforceable. In the alternative, if this Court identifies a material fact dispute regarding the formation of an agreement to arbitrate, it should order a trial on the issue.

### I.   No agreement to arbitrate exists between Mr. Wolters and Stake.

Stake's offer to arbitrate disputes limits the manner of accepting that offer to "agreeing to these Terms and Conditions" as a whole. Terms §§ 26.3, 26.6(a). Accordingly, Mr. Wolters could only have formed an agreement to arbitrate if he formed an agreement to be bound by Stake's Terms and Conditions in their entirety. However, Minnesota's prohibition of unlicensed gambling forecloses the formation of any such agreement, so Mr. Wolters has never, and could never, agree with Stake to arbitrate.

#### A. This Court's analysis is bound by the Terms' specific written provisions conditioned upon agreement to the Terms as a whole.

The Federal Arbitration Act ("FAA") "places arbitration agreements on equal footing with other contracts." *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010). Accordingly, "before referring a dispute to an arbitrator, the

4

court," not an arbitrator, "determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019); *accord United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 788 (8th Cir. 2005) ("When deciding whether to compel arbitration, this court applies a two-part test: we must first consider whether a valid agreement to arbitrate exists. If a valid agreement exists, we then consider the scope of the agreement").

"To determine whether a valid agreement to arbitrate exists," federal courts "look to the forum state's contract law." *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019); *accord First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Accordingly, whether an agreement to arbitrate between Mr. Wolters and Stake has been formed must be determined using Minnesota state contract law.

The analysis is limited to the specific language that delegates Mr. Wolters' disputes to arbitration because, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 445 (2006). This is why, unless a party opposing a motion to compel arbitration challenges "the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-6. A challenge to the arbitration clause itself must be directed

5

to the specific "written provision[s] . . . to settle by arbitration a controversy" within a larger contract, rather than its entire section on arbitration. *See Rent-A-Center*, 130 S. Ct. at 2779 (citing 9 U.S.C. § 2). Mr. Wolters' opposition to the instant Motion is limited to such provisions, and so is this Court's analysis.

The only "written provision[s] . . . to settle by arbitration" included in any version of Stake's Terms and Conditions are its § 26.3[2] and the second sentence of its § 26.6(a)[3], which have remained materially unchanged since Mr. Wolters first

---

[2] "By agreeing to these Terms, you agree that any and all past, present and future disputes, claims or causes of action between you and Stake or any of its affiliates, subsidiaries, ultimate parent and parent companies, partners, officers, directors, employees, contractors, shareholders, agents, licensors, subcontractors or suppliers, which arise out of or are related in any way to these Terms, the formation of these Terms, the validity or scope of this clause 26 (Dispute Resolution and Agreement to Arbitrate), your Participation in or other access to or use of the Games or the Platform, or any other dispute between you and Stake or any of its affiliates, subsidiaries, ultimate parent and parent companies, partners, officers, directors, employees, contractors, shareholders, agents, licensors, subcontractors or suppliers, including as to the arbitrability of any of the foregoing, and whether arising prior to or after your agreement to this clause 26 (Dispute Resolution and Agreement to Arbitrate) (all of the foregoing, collectively "Disputes"), will be governed by the procedure set out below." ECF No. 14-5, Ex. D Stake.us Terms & Conditions, Aug. 15, 2025, § 23.3 (Earlier versions were different only in that they referred to "Terms and Conditions" instead of just "Terms").

[3] "By agreeing to these Terms, both you and Stake agree that any and all Disputes, including without limitation any question regarding the existence, validity, enforceability, or termination of these Terms and/or this clause 26 (Dispute Resolution and Agreement to Arbitrate) as well as the decision of whether the Dispute should be arbitrated in the first place, shall be referred to and finally resolved by arbitration administered by the American Arbitration Association (AAA), the rules of which are deemed to be incorporated by reference into this clause." ECF No. 14-5, Ex. D Stake.us Terms & Conditions, Aug. 15, 2025, §

6

used Stake.us. Mr. Wolters specifically challenges these provisions and these provisions only— arguing that no agreement to be bound by them has ever been formed. What remains of the Terms, including "the rest of [their] agreement to arbitrate claims," is not severable under the FAA. *Rent-A-Center* 130 S. Ct. at 2779. Thus, this Court's analysis is limited to the formation of the agreements to arbitrate in § 26.3 and the second sentence of § 26.6(a) of Stake's Terms and Conditions.

### B. Stake designated agreeing to the Terms as the manner of accepting its offers to arbitrate.

Both § 26.3 and the second sentence of § 26.6(a) of the Terms begin with, "[b]y agreeing to these Terms," followed by language delegating the resolution of certain disputes to the American Arbitration Association ("AAA").[4] Thus, to

---

26.6(a) (Earlier versions were different only in that they did not include "as well as the decision of whether the Dispute should be arbitrated in the first place").

[4] While the first sentence of § 26.6(a) is "We both agree to arbitrate," this language does not identify a controversy or category of dispute to delegate to an arbitrator. Accordingly, it is not entitled to enforcement under the FAA. *See* 9 U.S.C. § 2 (contemplating written provisions "to settle by arbitration *a controversy*") (emphasis added). Instead, "We both agree to arbitrate" is part of the "remainder of the contract" and thus, does not get severed along with the sentence that follows it. *Buckeye Check Cashing*, 546 U.S. at 445; *see also Rent-A-Center*, 130 S. Ct. at 2779. In any case, "courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1193 (2023) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "We both agree to arbitrate" neither clearly nor unmistakably delegates the arbitrability of Mr. Wolters' claims to an arbitrator, so it should not be considered in resolving Stake's instant Motion.

7

accept its offer to arbitrate disputes, Stake required Players to agree to the broader

Terms and Conditions. While the validity of a broader contract containing an

arbitration agreement is typically irrelevant to a motion to compel arbitration, the

plain language of Stake's offer to arbitrate makes it relevant here.

Under controlling Minnesota law of contract formation, "[i]f an offer limits

the manner of acceptance, the acceptance must comply with the terms of the offer."

*Hearing Assocs., Inc. v. Downs*, 2017 WL 2414852 at *8 (Minn. App. June 5,

2017) (citing Restatement (Second) of Contracts § 60 (1981)). As a result, because

"[t]he formation of a contract requires . . . acceptance," this Court must determine

whether Mr. Wolters and Stake formed an agreement to be bound by the Terms as

a whole to determine the existence of an agreement to arbitrate between the parties.

*Com. Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. App.

2006).

Stake "was the master of its agreement to arbitrate . . . so if it wished to have

the arbitration agreement bind the parties" in a manner that does not integrate the

validity of the Terms as a whole, "it certainly could have done so." *Foster v.

Walmart, Inc.*, 15 F.4th 860, 862-63 (8th Cir. 2021) (holding that Walmart, whose

arbitration provision designated "using or accessing the Walmart Sites" as its sole

manner of acceptance, "cannot now change the terms and argue that acceptance

occurred at some other point"). Instead, Stake begins its offer to arbitrate with "By

agreeing to these Terms." Mr. Wolters did not (and could not) do so. Thus, he could not have accepted Stake's offer to arbitrate.

### C. Mr. Wolters could not agree to the Terms because they are void for violating Minnesota's public policy prohibiting unlicensed gambling.

The Terms belong to a category of agreements that can never be legally formed in Minnesota. Accordingly, Mr. Wolters never agreed to be bound by them, nor Stake's offer to arbitrate.

### 1. Contracts in Minnesota are void if they contemplate the unlicensed provision of services in violation of statutes intended to protect the public.

In Minnesota, if the state legislature (1) requires a license to engage in a certain business, (2) prohibits and penalizes the unlicensed operation of that business, and (3) does so to promote a public policy intended to protect the public, no contract to engage in that business can be created. *Lew Bonn Co. v. Herman*, 135 N.W.2d 222, 225 (Minn. 1965) ("[T]he general rule is that a contract entered into in violation of a statute which imposes a prohibition and a penalty for the doing of an act, such as the pursuit of a business, profession, or occupation without procuring a license or permit required by law for the protection of the public, is void."); *accord Woischke v. Stursberg & Fine, Inc.*, 906 N.W.2d 586, 594 (Minn. App. 2018), vacated on other grounds in *Woischke v. Stursberg & Fine, Inc.*, 920 N.W.2d 419 (Minn. 2018) ("When a party contracts to perform services that are prohibited and penalized by statute," that contract is void if the legislature so

intended, "and that intent is inferred if the objective of the law is to protect the public rather than merely raise revenue"). Furthermore, Minnesota courts hold that a contract is void when "illegality has so tainted the transaction that enforcing the contract would be contrary to public policy." *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 92-93 (Minn. 2006). And a "void contract" is "[a] contract that is of no legal effect, so that there is really no contract in existence at all." Black's Law Dictionary (12th ed. 2024). Stake's Terms are void under this analysis, so Mr. Wolters has never agreed to them nor, as a consequence, could he accept Stake's offer to arbitrate.

The applicable standard for this issue was born 165 years ago in *Solomon v. Dreschler*, and "has not been materially altered to this day." *Woischke*, 906 N.W.2d at 589.

In *Solomon v. Dreschler*, the Minnesota Supreme Court determined that a contract for the sale of liquor by someone without a statutorily required license was void. 4 Minn. 278 (Minn. 1860). The court so held by adopting an approach to "examine the statute [requiring a license] as a whole to find out whether or not the makers of it meant that a contract in contravention of it should be void." *Id.* at 279 (quotations omitted). Furthermore, the court distinguished between statutes that require licenses for the purpose of raising revenue rather than for "the protection of the public health or morals," holding that only the latter implicate legislative intent

10

that a violative contract be void. *Id.* The court found that the statutory conditions for receiving a liquor license, including that no gambling be permitted in the building designated for liquor sales, "clearly indicate that the object of the act is in the main to protect the public against the evils which are generally supposed to result from the unrestrained traffic in spirituous liquors, and that the revenue is merely an incident." *Id.*

Courts deciding the same issue have universally affirmed this analysis. *E.g.*, *Woischke*, 906 N.W.2d at 594 (describing at length that the analysis from *Solomon* is still the law of the land and holding "[a] contract involving illegally conducted business is itself void and unenforceable if the legislature has expressly or implicitly declared its intent that such a contract be illegal"); (*In re Peterson's Estate*, 42 N.W.2d 59, 62 (Minn. 1950) ("Although the general rule is that a contract executed in violation of a statute which imposes a prohibition and a penalty for the doing of an act—such as the pursuit of an occupation, business, or profession without being possessed of a license as required by law for the protection of the public—is void, such rule is not to be applied in any particular case without first examining the statute as a whole to find out whether or not the legislature so intended." (citing *Solomon*, 4 Minn. at 279)); *Dick Weatherston's Associated Mechanical Services, Inc. v. Minnesota Mutual Life Insurance Company*, 100 N.W.2d 819, 824 (Minn. 1960) ("[A] contract executed in violation

11

of a statute imposing a prohibition against the carrying on of a business or occupation without first having secured a license is void"); *Lew Bonn Co.*, 135 N.W.2d at 225 (Minn. 1965); *Isles Wellness, Inc. v. Progressive N. Ins. Co.*, 725 N.W.2d 90, 92 (Minn. 2006).

Under this analysis, due to Minnesota's gambling statutes' "prohibition[s] against specified unlicensed conduct and a purpose to protect the public from harm," Stake's Terms are void and, consequentially, it is impossible to satisfy the precondition necessary to form Stake's agreement to arbitrate. *Woischke*, 906 N.W.2d at 590.

> ### 2. The Terms are void because they primarily convey the ability to use Stake.us, which is prohibited and penalized by Minnesota statutes intended to protect the public from unlicensed gambling.

Stake's Terms are void pursuant to 165 years of Minnesota precedent because (1) their purpose is to provide gambling services that Stake lacks a license to legally provide; (2) the Minnesota legislature prohibits and penalizes the unlicensed provision of those gambling services; and (3) the intent of these prohibitions and penalties is to protect the public by preventing the unaccountable operation of a gambling business in Minnesota.

> ### i. Minnesota law requires, and Stake does not and could not possess, a license to operate a gambling business like Stake.us.

Users of Stake.us buy the digital equivalent of casino chips, wager them on games of chance such as poker, roulette, slot machines and other common

12

gambling games, and cash out their winnings. Compl. ¶ 52. Receiving and recording bets[5] and setting up a "gambling device"[6] for the purpose of gambling is illegal unless "authorized under chapter 349" of the Minnesota Civil Code. Minn. Stat. §§ 609.76, subd. 1(4, 7); 609.761, subd. 1.

Sections 349.155 and 349.16 of Chapter 349 require a license to conduct lawful gambling in Minnesota. Chapter 349 permits exclusively "organizations"—defined as "fraternal, religious, veterans, or other nonprofit organizations"—to obtain such a license. Minn. Stat. § 349.12. Stake does not possess such a license, nor could it ever obtain one because it is a for-profit organization.

> ii. **_Minnesota law prohibits and penalizes the unlicensed operation of Stake.us._**

---

[5] A "bet" is a "bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property, or benefit dependent upon chance." Minn. Stat. § 609.75, subd. 2. As alleged in Mr. Wolters' complaint, "[e]ach time a Player wagers Stake Cash or Gold Coins" constitutes a "bet" according to the statutory definition. Compl. ⁋ 22-28.

[6] A "gambling device" is "a contrivance the purpose of which is that for a consideration a player is afforded an opportunity to obtain something of value, other than free plays . . . the award of which is determined principally by chance." Minn. Stat. § 609.75, subd. 4. The definition includes "a game or device that simulates one or more games commonly referred to as poker, blackjack, craps, hi-lo, roulette, or other common gambling forms, though not offering pecuniary award or gain to its players." Minn. Stat. § 607.75, subd. 8. As alleged in Mr. Wotlers' complaint, the statutory definition of "gambling device" includes Stake.us. *See* Compl. ⁋ 29-37.

Operating a gambling business like Stake.us is criminally prohibited and penalized if it is not conducted in compliance with Chapter 349 of the Minnesota Code, including its license requirement. *See* Minn. Stat. § 609.761, subd. 1.

The Minnesota legislature has specifically identified over a dozen categories of conduct that constitute criminally illegal gambling activity subject to varying penalties. *See* Minn. Stat. §§ 609.755, 609.76. For instance, "[w]hoever instructs another person to violate" criminal gambling laws "is guilty of a felony." Minn. Stat. § 609.76, subd. 7. Through its marketing and user interface, Stake misrepresents the legality of its website and necessarily instructs people to use it. Doing so without a license is a felony in Minnesota.

Furthermore, the Minnesota legislature penalizes violations of its gambling prohibitions by empowering its constituents to privately enforce them. Minn. Stat. § 541.20 permits individuals who have lost money to another via unlawful gambling "to sue for and recover such money by a civil action," and § 541.21 provides that contracts whose consideration includes a gambling debt "shall be void and of no effect." Together, these statutes deputize Minnesotans by giving them the right to recover their illegal gambling losses and protects that right by foreclosing the existence of contracts that would otherwise corrupt it. Furthermore, these statutes are consistent with the Minnesota legislature's intent to prohibit and penalize unlicensed gambling.

14

### iii. *Minnesota prohibits and penalizes Stake.us to promote its public policy of protecting its citizens from unregulated gambling.*

Minnesota's gambling restrictions exist to protect the public from the perils of unregulated gambling. Specifically, the express purpose of Chapter 349 is "to regulate lawful gambling, to ensure integrity of operations, to provide for the use of net profits only for lawful purposes, and to authorize only those games or game features discussed in this chapter." Minn. Stat. § 349.11. While statutes whose purposes are to raise revenue may not indicate legislative intent that certain contracts be void, Chapter 349's purpose is much broader because, like the requirement to obtain a license to sell liquor, it "has in view more than the mere raising of revenue. If it had not, it would have been sufficient to have provided for a license at a stipulated sum, and imposed a penalty for selling without one." *Solomon*, 4 Minn. at 279; *see also Woischke*, 906 N.W.2d at 588 (legislative intent that a contract be void "is inferred if the objective of the law is to protect the public rather than merely to raise revenue").

Far from merely collecting a fee for a license, the Minnesota legislature requires that "profits from lawful gambling may be expended only" for certain expenses and charitable purposes, such as "a contribution to a program recognized by the Minnesota Department of Human Services for the education, prevention, or treatment of problem gambling" and an "expenditure to honor an individual's

15

humanitarian service as demonstrated through philanthropy or volunteerism to the United States, this state, or local community." Minn. Stat. §§ 349.15, 349.12, subd. 25(3, 19). Accordingly, the purpose of Chapter 349 is plainly to "protect the public against"—and even to offset the harmful impacts of—"the evils which are generally supposed to result from the unrestrained traffic in" gambling. *Solomon*, 4 Minn. at 281.

To promote this purpose, the Minnesota legislature created the Minnesota Gambling Control Board ("the MNGCB"), whose statutory duties include "to regulate lawful gambling to ensure it is conducted in the public interest" and "to take all necessary steps to ensure the integrity of and public confidence in lawful gambling." Minn. Stat. § 349.151, subd. 1, 20. In performance of these duties, the MNGCB has passed hundreds of regulations that protect the public through strict licensure requirements (Minn. R. 7861.0220); detailed rules designed to ensure the fair operation of each permitted gambling game (Minn. R. 7861.0270 *et seq.*); established continuing education programs for employees of lawful gambling operations (Minn. R. 7861.0230, subp. 3); and much more.

Furthermore, Minnesota's gambling laws are enforced by the Alcohol and Gambling Enforcement Division of the Minnesota Department of Public Safety. That Department is primarily responsible for enforcing criminal gambling restrictions. Accordingly, because the legislature specifically provided for its

16

gambling laws to be enforced by individuals whose jobs are to protect the public, it is plainly evident that the purpose of those laws is also to protect the public.[7]

Because the Minnesota legislature requires a license to operate a gambling business, prohibits and penalizes doing so without a license, and does so to protect the public, the Terms *are* void, and so is their purported agreement to arbitrate.

### D. There is no agreement to arbitrate Mr. Wolters' claims because no agreement to be bound by the Terms was ever formed.

The only "written provision[s] . . . to settle by arbitration a controversy" (9 U.S.C. § 2) in Stake's Terms begin with the phrase "[b]y agreeing to these Terms." That precondition for the formation of an agreement to arbitrate delegates the issue to this Court. District courts decide whether an agreement to arbitrate exists, and Stake designated the formation of an agreement to be bound by the Terms as the necessary condition for forming an agreement to arbitrate.

No agreement between Mr. Wolters and Stake to be bound by the Terms has ever been formed because the Terms are void pursuant to over a century-and-a-half

---

[7] Attorney General Keith Ellison recently published a press release, joined by Minnesota Department of Public Safety Commissioner Bob Jacobson, warning that so-called "social casinos" like Stake.us are illegal in Minnesota: "Trying to rebrand poker chips as virtual currencies does not change the fact that these online gambling operations are unlawful. By continuing to operate online gambling sites in Minnesota, these operators are likely openly defying our State's laws and I will not stand for it." *Attorney General Ellison directs illegal gambling websites to stop offering services in Minnesota*, Nov. 5, 2025, https://www.ag.state.mn.us/Office/Communications/2025/11/05_IllegalGambling Websites.asp (last accessed Dec. 4, 2025).

17

of Minnesota precedent. And because no agreement to be bound by the Terms exists, no agreement to arbitrate was, or could be, formed. Accordingly, this Court should deny Stake's Motion.

## II. The purported agreement to arbitrate is also unenforceable because it is unconscionable.

In addition to the illegality of the Terms under Minnesota's gambling laws, Stake's arbitration provision also fails because Stake's Terms are unconscionable and it designated agreeing to its unconscionable Terms as the manner of accepting its offer to arbitrate disputes. Consequentially, because the manner of acceptance is such a fundamental aspect of an agreement, Stake's "written provision[s] . . . to settle by arbitration" are unconscionable.

This Court may decline to enforce arbitration provisions "upon such grounds as exist at law or in equity for the revocation of any contract," (9 U.S.C. § 2) including unconscionability. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (holding that the FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability" (quotations omitted)). Because the only way to accept Stake's offer to arbitrate is to agree to unconscionable Terms, this Court should deny Stake's Motion to Compel Arbitration.

## A. Contracts that are unreasonably favorable to one party and to which the other party did not have a meaningful chance to agree are unconscionable.

18

Under Minnesota law, "[u]nconscionability has two aspects, procedural and substantive." *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F. Supp. 1368, 1375 (D. Minn. 1982). "Substantive unconscionability arises when the terms of the contract itself are unreasonably favorable" to the party seeking to enforce it, and "procedural unconscionability arises if [the other party] had no meaningful choice but to accept the contract." *Butler v. ATS Inc.*, Case No. 20-CV-1631 (PJS/LIB) 2021 WL 1382378 at 19 (D. Minn. Apr. 13, 2021) (quotations omitted). "If a court determines that a contract contains an unconscionable clause, it may refuse to enforce the contract, enforce it without the offending language, or limit application of the unconscionable clause to avoid any unconscionable result." *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., Inc.*, 589 N.W.2d 499, 503 (Minn. App. 1999). However, an unconscionable manner of acceptance is irredeemable because "[i]f an offer limits the manner of acceptance, the acceptance must comply with the terms of the offer." *Hearing Assocs., Inc.*, 2017 WL 2414852 at *8 (citing Restatement (Second) of Contracts § 60 (1981)). Thus, if this Court were to reform the manner of accepting Stake's offer to arbitrate to cure its unconscionability, Mr. Wolters could have only agreed to arbitrate in a manner that complies with the terms of that new offer. Of course, it is impossible that he could have already agreed to arbitrate his claims in "compl[iance] with the terms" of a future, revised manner of acceptance. *Id.*

19

Thus, the requirement to agree to the unconscionable Terms makes the agreement to arbitrate unconscionable and the Court should refuse to enforce such agreement and deny Stake's Motion to Compel Arbitration.

## B. The Terms are substantively unconscionable because they unreasonably favor Stake by insulating it from liability.

The Terms, to which Mr. Wolters must have agreed in order to agree to arbitrate, are substantively unconscionable because they delay and dissuade litigation in a manner that is unreasonably favorable to Stake.

### 1. *The Terms make it practically impossible for anyone with claims against Stake to ever vindicate their rights.*

First, the Terms prohibit potential plaintiffs against Stake from freely choosing their own representation. Stake's Terms prohibit collective action. Terms § 26.7(a). Per Terms § 26.7(b), it is a violation of Stake's collective action ban if "claims are filed or pursued concurrently by or on behalf of two or more persons" and "counsel for the two or more persons is the same, or share fees, or coordinate in any way." Accordingly, if someone wants to sue Stake, the Terms prohibit them from hiring an attorney who represents someone else suing Stake. The effect of this overbroad collective action ban is to delay the resolution of individual claims into perpetuity.

Mr. Wolters alleges that "thousands, if not tens or hundreds of thousands" of Minnesota residents have used Stake.us within the relevant statute of limitations.

20

Compl. ¶ 76. Considering that there are likely less than a dozen consumer lawyers in Minnesota who may be willing to arbitrate individual claims against Stake, and that the American Arbitration Association estimates that "the average disposition time for an arbitration takes a little under seven months," there is no feasible way for all putative class members to vindicate their rights. *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1040 (N.D. Cal. 2022) (finding a similar provision unconscionable because "[d]elaying the ability of one to vindicate a legal claim by years, potentially *156 years*, conflicts with one of the basic principles of our legal system – justice delayed is justice denied" (cleaned up)). Meanwhile, Stake is free to choose its own attorneys and, thus, may sue anyone bound by the Terms whenever it pleases.

Beyond being unreasonably one-sided, this prohibition is unconscionable because it "restrict[s] the freedom of clients to select counsel of their choice." *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354, 357 (Minn. App. 1995) (quotation omitted), *rev. denied* (Minn. 1996); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 368 n.16 (1985) (Brennan, J., dissenting) (noting that an "individual's right to ask for, and to receive, legal advice from the lawyer of his choice [is] fully protected by the First Amendment"). Denying this fundamental right unreasonably favors Stake because it practically ensures that the majority of Minnesotans with claims against it can never bring them. Accordingly,

21

the Terms are substantively unconscionable, and so is requiring their acceptance to accept a collateral agreement.

### 2. For the few that find individual legal representation against Stake, their arbitrations will necessarily be delayed even further by the Terms.

Beyond the delay associated with not being able to find a lawyer, Stake unduly benefits from the Terms' other provisions that also indefinitely delay litigation.

First, before initiating an arbitration, a plaintiff must exhaust Stake's Informal Complaint Resolution procedure. Terms § 26.5. While Stake will "endeavour" to respond promptly to complaints, nothing binds them to do so. Terms § 22.5. So, if a plaintiff waited years for a lawyer with experience arbitrating against Stake to become available, the commencement of their arbitration would be further delayed until Stake decided its internal complaint resolution process had been completed.

Second, if a plaintiff defies the odds and makes it to arbitration, they would be even further delayed because, to date, Stake has not registered its arbitration clause with the American Arbitration Association ("AAA"), which is a requirement of the organization.[8] Accordingly, if someone currently filed a AAA

---

[8] *American Arbitration Association Consumer Clause Registry*, https://apps.adr.org/ClauseRegistryUI/faces/org/adr/extapps/clauseregistry/view/pages/clauseRegistry.jsf (last visited Dec. 5, 2025) (no registered consumer

22

case against Stake, they would have to wait for AAA to review Stake's arbitration clause for, among other things, "material compliance with due process standards contained in the Consumer Due Process Protocol." AAA Rule R-12(b). This process itself would likely take considerable time because, even though Principle 9 of the AAA Consumer Due Process Protocol states that all parties in arbitration "have the right . . . to be represented by a spokesperson of their choosing," Stake's Terms do not permit potential claimants to hire their chosen spokesperson.

These artificial (and significant) delays unreasonably favor Stake because they effectively guarantee that, at best, only a very low percentage of people with claims against it will be able to bring them in arbitration. The provisions of the Terms that engineer and ensure these delays are substantively unconscionable, and so is any collateral requirement to agree to them.

### 3. The Terms otherwise prohibitively disincentivize arbitrating against Stake.

The Terms' liability limitations and its confidentiality clause make succeeding meaningfully in arbitration practically impossible, thereby disincentivizing potential plaintiffs and attorneys from arbitrating against Stake.

First, the Terms make it an absolute certainty that nobody who has used Stake.us for more than one month can be made whole. The Terms indemnify Stake

---

arbitration clauses under the business names "Sweepsteaks, Ltd.," "Sweepsteaks Ltd.," "Sweepsteaks, Limited," "Sweepsteaks Limited," "Stake," or "Stake.us."

against any claims related to "YOUR ACCESS TO OR USE OF THE PLATFORM" (§ 24.1(a)); and they provide that "TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES WILL WE . . . BE LIABLE TO YOU FOR MORE THAN THE AMOUNT YOU HAVE PAID US IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH COMPLAINT." Terms § 22.4(b). The Terms further insulate Stake from liability for attorney's fees (Terms § 24.1(1)) and punitive damages (Terms § 24.2(a)). Accordingly, even if a prospective plaintiff felt confident their claims would prevail in arbitration, they would likely lose money pursuing an arbitration award of, at most, a small percentage of their damages.

Second, the relative few who make it in front of an arbitrator will be at a severe disadvantage due to the Terms' confidentiality clause, which grants Stake exclusive access to "the existence, content, or results of any arbitration" against it. Terms § 26.6(b). As a result, Stake unfairly benefits from preventing the formation of any legal precedent regarding its illegal casino operation. Every victim who would be forced into confidential, individual arbitration is prevented from relying on any legal precedent that would be created if Stake's illegal operation were exposed to the disinfecting sunlight of a courtroom in previous cases. Instead,

24

Stake may tout any favorable result it receives from the private forum of its choice and bury any finding to the contrary.

The confidentiality clause is also unreasonably favorable to Stake because it grants a "repeat player" advantage over a "one-time player" who does not benefit from experience "developing work product, learning about arbitrators, and understanding legal issues." *Hoober v. Movement Mortg., LLC*, 382 F. Supp. 3d 1148, 1160 (W.D. Wash. 2019) (holding a confidentiality provision in an arbitration clause substantively unconscionable). While plaintiffs could alleviate this imbalance by hiring a lawyer with experience arbitrating against Stake, they would have to potentially wait for decades until such a lawyer is available to represent them. Accordingly, plaintiffs must choose between promptly bringing their claim and being represented by a "one-time player" or waiting indefinitely for an experienced "repeat player." *Id.*

### 4. *The unconscionable provisions of the Terms render the purported agreement to arbitrate with Stake unconscionable.*

Taken together, the many unconscionable provisions in the Terms make it practically impossible for a plaintiff to obtain the meaningful relief contemplated by the Minnesota Legislature. Accordingly, the Terms are substantively unconscionable. Furthermore, requiring acceptance of these Terms in order to agree to arbitrate is independently unreasonably favorable to Stake. Thus, because the agreement to arbitrate may not be formed without agreeing to the substantively

25

unconscionable Terms, the arbitration provision, itself, is substantively unconscionable.

**C. The Terms are procedurally unconscionable because Mr. Wolters cannot meaningfully agree to Terms that Stake may unilaterally change without notice.**

A contract is procedurally unconscionable where a party demonstrates it "had no meaningful choice but to deal with the other party and to accept the contract as offered." *Sports & Travel Mktg., Inc. v. Chicago Cutlery Co.*, 811 F. Supp. 1372, 1380 (D. Minn. 1993). Mr. Wolters has never meaningfully chosen to be bound by the Terms because Stake can amend the Terms without notifying Mr. Wolters, doing so most notably by adding an arbitration opt-out provision that expired 30 days after its addition. Accordingly, the Terms are procedurally unconscionable, and so is the offer to arbitrate that requires their acceptance. Since the Terms are also substantively unconscionable, this Court should refuse to enforce Stake's arbitration clause as unconscionable, too.

The Terms grant Stake "the right to amend these Terms and Conditions, or to implement or amend any procedures, at any time. Any amendments will be published on [Stake.us] and such changes will be binding and effective immediately. If you do not agree to the amended Terms and Conditions, you must stop using the platform." Terms § 27.2. Put differently, if users of Stake.us continue to use it after Stake amends the Terms without notice, they become bound

26

by those amendments. However, unwittingly becoming bound by a contract term is not a meaningful way to agree to it. Accordingly, binding users in this manner is procedurally unconscionable and taints the Terms as a whole.

Many courts have held that contracts where one party can unilaterally change the terms without notice—specifically arbitration agreements—are unenforceable. *E.g.*, *Close v. Penney OpCo LLC*, 787 F. Supp. 3d 1166, 1171 (W.D. Wash. 2025) (holding an arbitration agreement illusory because the defendant "could have 'terminated' the requirement that disputes would be resolved via arbitration"); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012) ("[I]f the other party can suddenly change the terms of the agreement to avoid arbitration, then the agreement was illusory from the outset"); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory") (citing *Floss v. Ryan's Family Steak Houses*, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000)); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1133 (7th Cir. 1997) (Cudahy, J., concurring)). If one party may terminate its own obligations under a contract without notice, the other party cannot meaningfully agree to that contract.

27

This unfairness is further demonstrated by the silent addition of an arbitration opt-out provision to the Terms, which Stake champions as proof that they do not "force" users into compulsory arbitration. ECF No. 14 at 4; Terms § 26.9. This amendment was added on August 23, 2024, without any notice to users, including Mr. Wolters—nearly two years after Mr. Wolters began using Stake.us. ECF No. 14-1, Declaration of Edward Craven, ¶¶ 10, 24. While Stake insists that, to opt out of arbitration, "[a]ll Plaintiff had to do was send written notice to Sweepsteaks Limited within 30 days of August 23, 2024," he obviously also had to know about his right to do that.[9] ECF No. 14 at 4.

However, Mr. Wolters understandably did not check the Terms for updates every day. Consequently, as of September 24, 2025, § 26.9 of the Terms bound Mr. Wolters "to be deemed to have accepted the arbitration and class action waiver provisions." *Id.* Mr. Wolters did not have a meaningful chance to agree to waive his ability to preserve his Seventh Amendment civil jury trial right. Accordingly,

---

[9] Notably, Stake admits that it knows how to notify its users of changes to the Terms. *See* Craven Decl. ¶ 12 ("When Plaintiff visited [Stake.us] on May 18, 2023, [Stake.us] presented a window containing an updated version of the Terms in their entirety. Before Plaintiff could proceed to play [Stake.us'] games, [Stake.us] required him to scroll through the entirety of the Terms and Conditions and check a box indicating his assent"). This indicates Stake deliberately chose not to notify Mr. Wolters and other users of the arbitration opt-out option, which should support this Court's finding of procedural unconscionability.

Terms § 27.2 and the rest of the Terms it permits to be unilaterally altered by Stake are procedurally unconscionable, as is any term requiring agreement to them.

**D. This Court should not enforce the purported agreement to arbitrate between Mr. Wolters and Stake because it requires acceptance of the unconscionable Terms and, thus, is itself unconscionable.**

Stake's Terms are substantively and procedurally unconscionable. Because Stake designated agreeing to these unconscionable terms as its manner of accepting its offer to arbitrate, any purported agreement to arbitrate is also unconscionable. Accordingly, this Court should find such agreement invalid and unenforceable and deny this Motion. *Plummer v. McSweeney*, 941 F.3d 341, 345 (8th Cir. 2019) ("We therefore take up the matter of unconscionability ourselves. Under the FAA, agreements to arbitrate 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. One of these grounds is unconscionability").

**III.   Stake has failed to meet its burden to prove that an agreement to arbitrate exists between itself and Mr. Wolters.**

Illegality and unconscionability aside, Stake has not sufficiently proven the formation of an agreement to arbitrate Mr. Wolters' disputes. Accordingly, if this Court does not agree with Mr. Wolters' arguments above, it should order a trial limited to the issue of formation of the arbitration agreement Stake seeks to enforce.

29

9 U.S.C. § 4 allows a "party aggrieved" to move a court to compel arbitration. "The party seeking to compel arbitration bears the burden to prove a valid contract." *Duncan*, 20 F.4th at 402 (8th Cir. 2021). "[I]f the motions record reveals a material issue of fact" regarding formation of the agreement to arbitrate at issue, "the FAA maintains that the court move summarily to trial." *Neb. Mach. Co. v. Cargotec*, 762 F.3d at 743 (8th Cir. 2014); *accord* 9 U.S.C. § 4. The evidentiary record produced by Stake is not sufficient.

As Stake indicates in its brief, whether a user of a website has agreed to its otherwise valid terms of use, and therefore any included agreement to arbitrate, is a fact-intensive inquiry.[10] *See* ECF No. 14 at 6-9. "Critical" to this inquiry "is the website's overall design and content, including whether the existence of the relevant terms are reasonably conspicuous." *Foster v. Walmart*, 15 F.4th at 863 (8th Cir. 2021). In *Foster v. Walmart*, the Eighth Circuit found that Walmart had not met its burden to prove the existence of an arbitration agreement based on a similar record produced by Stake here because:

> Among the yet-unanswerable questions are the exact location and prominence of the terms-of-use hyperlink, how many clicks it would have taken for the user to discover the arbitration provision, and

---

[10] To be clear, Mr. Wolters' primary position is that Stake's Terms are void for illegality and, thus, so are any purported agreements to arbitrate between himself and Stake. Analysis of this argument does not require the fact-intensive inquiry described in this section. However, if the Court disagrees, it still must thoroughly examine Stake.us' design to determine whether an agreement to arbitrate has been formed.

whether the website changed during the relevant period. Answers to factual questions like these are essential to determining whether this case belongs in arbitration or litigation.

*Foster*, 15 F.4th at 864 (quotations omitted).

Stake's only evidence that Mr. Wolters agreed to arbitrate is the conclusory statements in its brief,[11] the affidavit of its founder, and reproductions of the language of Stake's various Terms & Conditions. Not one of Stake's exhibits shows how the Terms & Conditions would have appeared to Mr. Wolters when he used Stake.us, let alone "the exact location and prominence of the terms-of-use hyperlink, how many clicks it would have taken for the user to discover the arbitration period, and whether the website changed during the relevant period." *Foster*, 15 F.4th at 864. Instead, Stake merely laid out the Terms to which it alleges Mr. Wolters agreed and alleged that he agreed to them.

The only other evidence produced by Stake is a purported "internal account record associated with Plaintiff, which indicates that he accepted the updated Terms and Conditions on May 18, 2023." Craven Decl. ⁋ 13; Ex. A. However, there is no indication that Exhibit A is associated with Mr. Wolters. Furthermore, Exhibit A says "Terms of Service" in bold letters at the top, and immediately

---

[11] For example, Stake asserts, without support, that "[t]he Platform presented the Terms plainly and clearly in hyperlinked blue text and explicitly prompted users to view and accept them before allowing them to proceed any further," and "Plaintiff cannot deny that he clicked the checkbox." ECF No. 14 at 8.

below it are the words "status" and "outdated." *Id.* This is far from clear proof that Mr. Wolters agreed to arbitrate his disputes and, if anything, indicates the opposite.

If Stake wants to compel this suit to arbitration, it bears the burden to prove an agreement to arbitrate exists. Stake has not adequately done so. Accordingly, this Court should deny Stake's Motion. Alternatively, this Court should hold a limited trial on the issue of contract formation.

## IV. This Court should not stay any deadlines during the pendency of the instant motion.

Although 9 U.S.C. § 3 requires this Court to stay proceedings if it grants Stake's Motion to Compel Arbitration, nothing requires it to stay anything else in the meantime. Accordingly, Mr. Wolters requests that this Court uphold all deadlines in this matter during the pendency of the instant Motion. Otherwise, Mr. Wolters would be prejudiced by waiting potentially a year from the filing of his Complaint to begin even the most preliminary stages of this litigation. Because "[j]ustice delayed is justice denied," this Court should not unnecessarily delay the resolution of Mr. Wolters' claims by issuing any stays beyond what the FAA requires. *Oetting v. Sosne (In re Green Jacobson, P.C.)*, 911 F.3d 924, 931 (8th Cir. 2018).

## CONCLUSION

Stake, an unlicensed Cypriot internet casino, wants to confidentially arbitrate Mr. Wolters' claims for harm he suffered due to its illegal gambling operation in

32

the state of Minnesota. Stake's offers to arbitrate may be accepted only by agreeing to its broader Terms. As written, the illegality of the Terms under Minnesota law precludes the formation and existence of any agreement to arbitrate. And even if such an agreement was created, it is unconscionable and unenforceable. Stake has therefore not satisfied its burden to prove the existence of an enforceable agreement to arbitrate, and this Court should deny Stake's Motion.

Dated: December 5, 2025

By: */s/ Vildan A. Teske*

Vildan A. Teske (#241404)
Lee Owen (#505523)
TESKE LAW PLLC
80 South Eighth Street, Ste. 900
Minneapolis, MN 55402
(612) 767-0521
teske@teskelaw.com
owen@teskelaw.com

Garrett D. Blanchfield (#2098550)
Brant D. Penney (#316878)
Roberta A. Yard (#322295)
REINHARDT WENDORF &
BLANCHFIELD
80 South Eighth Street, Suite 900
Minneapolis, MN 55402
Tel: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

Daniel C. Hedlund (#258337)
Daniel J. Nordin (#392393)
Joe E. Nelson (#402378)
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600

33

Minneapolis, MN 55402
(612) 333-8844
dhedlund@gustafsongluek.com
dnordin@gustafsongluek.com
jnelson@gustafsongluek.com

*Counsel for Plaintiff and the Putative Class*

34